## Starrett v. Commonwealth.

January 24, 1950.

J. B. Johnson, Judge.

Joe S. Feather, H. M. Sutton and Sam Cannon for appellant.

A. E. Funk, Attorney General, and Zeb A. Stewart, Assistant Attorney General, for appellee.

JUDGE KNIGHT—Affirming.

Appellant, 41 years of age, was convicted of the willful murder of his 79 year old father, Dee Starrett, and his punishment fixed at life imprisonment. He appeals from that judgment relying on one ground only for reversal: that the evidence was not sufficient to sustain the verdict and appellant's motion for a directed verdict should have been sustained by the trial court. This will necessitate some analysis of the evidence in the case.

Lizzie Starrett, wife of appellant, testified that he had been drinking heavily on the afternoon and evening of the killing, which took place on the night of April 16, 1948, and had fired several shots from his pistol in the neighborhood of their home near Gatliff. Fearing for the lives of herself and children, she left her home, taking her children with her, and went to the home of appellant's father, Dee Starrett, who lived about a quarter of a mile away. After remaining there a short time she proceeded to Gatliff to call the county officers to come and arrest her husband, after which she and the children, fearing to return home, went to the home of Mike Starrett, brother of appellant, to spend the night. Later in the night appellant came to the home of Mike Starrett, threatened the lives of his wife and the members of Mike's family saying "I'm going to kill her and everyone of you'uns. I'm going to clean up on all of them. I don't even aim to leave nary one of them to tell the tale." She testified that he owned a .38 caliber pistol of the type shown her on the witness stand and that she had heard her husband threaten to kill his father for cutting his timber, destroying his property and stealing his tools.

Billy Starrett, 20 year old son of appellant, testified that his father was drinking on the day of the killing; that he had a loaded Smith & Wesson pistol which looked like the one shown him on the day of the trial; that his father was quarrelsome and easy to get mad; that his father had quarreled with deceased and he had heard him threaten to knock deceased in the head.

Rosie Starrett, wife of deceased and mother of appellant, testified that appellant came to her home on the night of the killing. He had a shotgun with him and he was drinking and in an ugly and threatening mood. She was scared and, fearing trouble, left with her 13 year old granddaughter who lived with her and went to the home of another son, Mike Starrett, where she remained until about midnight when appellant came there looking for his wife. He made his mother and the granddaughter accompany him back to her home telling her "Pap" was up there "hollering" for her and she had to go home to tend to him. When she left home earlier in the evening deceased was dressed in his underwear sitting on a cot; when she returned after midnight with her granddaughter and appellant, she found the lamp globe broken out in the yard and on the inside of the house her husband was lying on the iron bed with his head covered up. Appellant called his "Pap" and, receiving no answer, said "Pap must be asleep." He then laid the cover back and said "Lord have mercy, something has happened to Pap, reckon what it could be." There was a bullet hole on the left side of his face, blood was coming from his mouth and he showed no signs of life.

Nadine Murray, granddaughter of Dee and Rosie Starrett, lived with them. She corroborated the testimony of her grandmother but in addition to the shotgun which the grandmother said appellant was carrying that night, she testified that she saw a pistol sticking from his hind pocket; that he shot once in the yard with his shotgun; that he was drinking; that he threatened his mother and cursed her; that on his first trip to their house that evening she had seen appellant slap his father and put a shotgun in his face in a threatening manner.

Mike Starrett, brother of appellant, corroborated the testimony of the witnesses above as to the visits to his home on the night in question of appellant's wife and children, his mother and niece, to escape from appellant, his threats against them all, his drunken condition, his possession of a pistol and shotgun on that night and his threats against his father. He testified that appellant came to his house the next day after the killing telling him "the old man had a heart attack or high blood pressure had struck him and he was dead."

Cebert Peace testified that appellant came to Red

Bill Monhollen's house about 11 o'clock on the night of the killing, under the influence of liquor; that he told this witness he had done enough that night to be "penitentured" or go to the electric chair but he didn't aim to be arrested that night and was not ready to go to jail; that appellant had a shotgun and nicked a green shell (filed as an exhibit) and said "That one's for the law;" that he said "he had blowed one damn man's brains out up there on the hill;" that he left Monhollen's house about midnight.

A magistrate and constable of Whitley County testified that they received a call on the night of the murder and went to the home of appellant, then to Red Monhollen's looking for him; that they then went to the home of Dee Starrett and found the deceased lying in bed with a bullet hole in his temple; that they later arrested appellant and took from him 9 shotgun shells; that they found a .38 pistol at appellant's home hidden under a davenette, the pistol having 6 empty shells which had been recently fired. The sheriff of Whitley County also testified that he viewed the body of deceased and he described the wound in the left temple as about the size of a lead pencil or a .38 bullet; that he found a bullet hole through the wall of the box house and a bullet which had hit the screen door and fallen through a crack in the porch. He identified this bullet as a .38 special, and it is filed here as an exhibit.

Dr. Sanders and Mr. Moses, deputy coroner, who viewed the body at the undertaker's testified as to the nature and location of the wound; that the bullet had entered near the temple and ranged down through the mouth and passed on through; that the wound indicated that it had been made by a .38 bullet which was the cause of the death of deceased.

Appellant took the witness stand in his own defense and denied that he killed his father or that he had ever threatened to kill him. He admitted being at his father's home before and after the killing; admitted being intoxicated on that night and that he had tried to get more liquor. He admitted having a shotgun on that night but denied having a pistol, claiming it had been stolen from him. One of his brothers, Cecil Starrett, who lives in Harlan County, testified that so far as he knew about them, appellant and his father got along all right and

80

he never heard of any threats made by appellant against deceased.

We have carefully read the three volumes of testimony and from it all and from the reasonable inferences to be drawn therefrom, we are of the opinion that it was sufficient to take the case to the jury and to sustain its verdict, and that the court did not err in refusing to sustain appellant's motion for a directed verdict. It is significant that appellant's wife, mother, son, brother and niece testified against him. It is true that none of them and no other testimony of any eyewitness connected him directly with the murder of his father, but we think the circumstantial evidence, together with the proven facts and the admissions made in the presence of Cebert Peace, if true, and which the jury evidently believed, point inevitably to appellant's guilt. A great deal of the testimony introduced, such as threats and other acts toward members of his family, was for the purpose of showing appellant's state of mind on the day in question, and the court was careful to admonish the jury that it could be considered for that purpose only. Appellant, the father of nine children, was ably represented by competent counsel appointed by the court to defend him. He had a fair trial and he has no right to complain that a jury of his peers has found him guilty of the crime of patricide brought about, no doubt, by the state of mind he was in as the result of his indulgence in liquor.

Judgment affirmed.